IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **JAMES CARUTH,** | |
| **Plaintiff,** | |
| v. | Case No. 16-cv-10340 |
| **RANDY PFISTER, et al.,** | Judge Mary M. Rowland |
| **Defendants**. | |

### MEMORANDUM OPINION & ORDER

Plaintiff James Caruth, a former inmate at Northern Reception Classification Center, brings suit under 42 U.S.C. § 1983 alleging that prison officials and/or officers Randy Pfister, Sherwin Miles, Darrin Hunter, Tracy Engleson, and Pedro Dominguez violated his rights to the free exercise of religion by subjecting him to group strip searching practices. Before the Court is Defendants' motion for summary judgment. [118] [120]. For the reasons set out below, Defendants' motion is granted.

### BACKGROUND

Plaintiff Caruth is an inmate at Pontiac Correctional Center, an Illinois Department of Corrections ("IDOC") facility. (Dkt. 130 at ¶ 4). At all times pertinent to this action, however, Caruth was an incarcerated at Northern Reception Classification Center ("NRC"), another IDOC facility. (Dkt. 123 Exhibit 1 at ¶ 3). During this time, Defendants worked at NRC in various capacities. (*Id*. a ¶¶ 4-8). Defendant Pfister was the warden of NRC, Defendant Miles was an assistant warden,

1

Defendants Hunter and Engleson were superintendents, and Defendant Dominguez was a correctional officer. (*Id.*)

Caruth has been a devout and practicing Muslim since 1995. (Dkt. 130 at ¶ 1). He claims that modesty is a central tenet of Islam and "that to be naked in front of [an]other person is a sin." (*Id.* at ¶¶ 2-3). Every time Caruth travelled to and from court, he had to submit to a group strip-search. (Dkt. 123 at ¶¶ 21; 27). Approximately thirty inmates, including Caruth, would be searched simultaneously by two officers. (*Id.* at ¶¶ 17; 19). Although Caruth requested to be strip-searched in a non-group setting on account of his Muslim faith, his requests were denied. (Dkt. 130 at ¶ 9). Caruth brings the present action under 42 U.S.C. § 1983, claiming that Defendants infringed his rights to freely exercise Islam by requiring him to submit to group strip searches.

## **LEGAL STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986).

After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). Construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## ANALYSIS

### I. Personal Involvement

Defendants argue that the claims against them should be dismissed because, excepting Defendant Dominguez, they did not personally participate in the challenged strip searches. To hold an individual liable under Section 1983, "a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009) (internal quotations omitted). "To be personally responsible, an official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (internal quotations omitted).

The Court agrees that summary judgment should be granted to Defendant Pfister on these grounds. Caruth admits that Pfister was not present during any of

the challenged searches and fails to present any facts indicating that Pfister knew about his complaints regarding the strip searches or failed to address them. (Dkt. 123 at ¶ 23). Caruth admits that he "sued Defendant Pfister because it's his ship. He's responsible. He's the chief administrator [sic] officer and he's responsible for his officers and employees." (*Id.* at ¶ 24) (internal quotations omitted). It is clear from this statement that Caruth impermissibly relies on a theory of *respondeat superior* for his § 1983 claim against Pfister. *See e.g, Robinson v. Welborn*, 107 F.3d 873 (1997) ("A prisoner, in a § 1983 case, may not recover damages from a supervisory official under the doctrine of *respondeat superior*."). Consequently, the Court grants summary judgment against Caruth on his claim against Defendant Pfister.

As to Defendants Engleson, Miles, and Hunter, although Caruth admits they were not physically present during the strip searches (Dkt. 123 at ¶¶ 22; 25-26), Caruth stated during his deposition that (in so many words) he informed each of them that the strip searches violated his free exercise rights on account of his being Muslim, but that they failed to take action. (Dkt. 119 Exhibit 3 at 37-43). These facts are unrebutted by Defendants. (*See* Dkt. 120 at 7). The Court therefore declines to grant the remaining Defendants summary judgment on account of their lack of physically involvement in the strip searches.[1]

## II. Plaintiff's Free Exercise Claim

### A. Legal Standard

---

[1] On the day Caruth filed his response, he filed a motion requesting permission to conduct discovery to discover the identities of prison personnel who were present when he was strip searched. (Dkt. 124 at 1). That request, brought more than a year after discovery had closed, was denied by the Court. (Dkt. 128).

4

Caruth's Section 1983 claim is based on a violation of his First Amendment free exercise rights. The Free Exercise Clause of the First Amendment "prohibits the state from imposing a substantial burden on a central religious belief or practice," by "pressuring him to either commit an act forbidden by the religion or by preventing him from engaging in conduct which his faith mandates." *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013); *McRoy v. Cook Cty. Dep't of Corr.*, 366 F. Supp. 2d 662, 673 (N.D. Ill. 2005), *aff'd sub nom. McRoy v. Sheahan*, 205 F. App'x 462 (7th Cir. 2006). Caruth argues that because being seen nude in front of even a single non-Muslim is violative of his religion, Defendants requiring him to be seen nude in front of 29 other inmates and two officers during group strip searches substantially burdened his religious beliefs. (Dkt. 119 Exhibit 3, Deposition of J. Caruth at 37-43) ("My problem wasn't about being striped searched, my problem is about being striped searched in front of others.").

An inmate's religious freedoms, however, must be balanced against the realities of running a correctional facility and with deference to the judgment of prison officials: "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S 78, 84-85 (1987). Thus, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89; *Kaufman*, 733 F.3d at 696. In assessing the reasonableness of a prison regulation, federal courts apply a

four-part test. *Turner*, 482 U.S. at 89-91; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350-53 (1987) (applying *Turner* test to free exercise challenge to prison practices); *Tarpley v. Allen Cty., Indiana*, 312 F.3d 895, 898-89 (7th Cir. 2002) (same).

Under the *Turner* test, the court must first find that there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," so that the "policy [is not] arbitrary or irrational." 482 U.S. at 89-90 (internal quotations omitted). Second, the court considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, courts assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, courts consider whether there are "obvious, easy alternatives" to the regulation that show it is "an exaggerated response to prison concerns." *Id.* (internal quotations omitted). "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 90-91 (italics in original). The burden of proving the invalidity of the regulation lies with the prisoner and "substantial deference" is given to the professional judgment of prison administrators. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

### B. Application of *Turner* to the Present Case

Applying the *Turner* factors to the present facts, summary judgment in favor of Defendants is warranted because on the evidence submitted to the Court a

6

reasonable trier of fact could not find that Caruth's free exercise rights were substantially burdened without a legitimate penological interest. The Court reiterates that Caruth does not argue that strip searches fail to serve legitimate penological interests. Rather, he challenges the *group* nature of the strip searches at NRC. The Court must analyze the *Turner* factors bearing this in mind.

### i. Factor One: Rational Relation to Penological Interests

First, the sworn declaration of NRC Shift Commander Theodore Fredericks explains that group strip searches are necessary at NRC due to the limited quantity of staff available. (Dkt. 119 Exhibit 4 at ¶¶ 8-9). Fredericks explains that prison officers "have defined security roles at all times" and "removing correctional officers from their security posts in order to conduct private strip searches" would create security risks. (*Id.*) Caruth does not rebut Fredericks' statements with evidence of his own but argues that "there cannot be a protection of the safety of staff, or of incarcerated persons, by providing only 2 guards for as many as 30 inmates." (Dkt. 122 at 6). Caurth's argument fails to address: (1) the limited staff available to conduct strip searches; or (2) the fact that removing staff from other positions would create vacancies in other areas of the prison and give rise to security issues. *Cf Show v. Patterson*, 955 F. Supp. 182, 190 (S.D.N.Y. 1997) (denying summary judgment to defendants on free exercise claim challenging group strip search of Muslim inmate in part because "approximately fifteen guards were present when the inmates were ordered to remove their clothes.").

7

Caruth asserts that there is no "valid, rational connection" between group strip searches and the asserted safety interests because group strip searches violate the following Illinois regulation:

> Strip searches … of committed persons shall be conducted by persons of the same sex as the committed person and in an area where the search cannot be observed by persons not conducting the search, except in cases of an emergency.

Ill. Admin. Code 20, § 501.220(b)(2). First, it is unclear whether NRC's group strip search policy violates this regulation. The parties agree that strip searches are "conducted in a side room" in the presence of only the two officers conducting the search. (Dkt 123 at ¶¶ 18-19). While each of the 30 inmates can observe their fellow inmates, it is unclear whether the regulation aims to prevent these inmates from observing one another or is intended to prevent officers and inmates who are not participating in or subject to a search from being present and therefore observing inmates who are being searched. But assuming the group strip searches violate the state regulation, Caruth does not explain how a violation of this regulation invalidates the asserted security goals behind group strip searches. There is no evidence, for example, that the regulation was implemented to further security goals (as opposed to protecting the inmate's privacy) such that violating it would cast doubt on Defendants' explanation that group searches are necessary for safety.

Moreover, a "'[m]ere violation of a state statute [or regulation] does not infringe the federal Constitution.'" *Archie v. City of Racine*, 847 F.2d 1211, 1216 (7th Cir. 1988) (quoting *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S. Ct. 397, 402, 88 L. Ed. 497 (1944)). Caruth cites to the Seventh Circuit's opinion in *Mays v. Springborn*, where in the

8

context of an Eighth Amendment challenge to a group strip search, the court observed that "although violation of the prison's rule against public searches was not, by itself, a violation of the constitution, it was relevant evidence on which the jury could have relied to conclude that the searches were done with an intent to harass." 575 F.3d 643, 650 (7th Cir. 2009) (internal citations omitted). *Mays*, however, has limited application outside of the Eighth Amendment context where plaintiff must demonstrate that defendant acted with an intent to harass. *Id.* at 649 (strip search violates the Eighth Amendment if it is "conducted in a harassing manner intended to humiliate and cause psychological pain."). *But see Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (in the context of a Fourth Amendment claim, "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established."); *Estate of Carlock v. Williamson*, No. 08-3075, 2013 WL 12244415, at *7 (C.D. Ill. June 21, 2013) (finding that the court's ruling in *Mays* considering a violation of state or department policies only extends to constitutional claims requiring subjective intent); *Davis v. Nanny*, No. 3:13-CV-1260-SMY-RJD, 2018 WL 2087994, at *2 (S.D. Ill. May 4, 2018) (concluding that "Seventh Circuit precedent dictates that evidence regarding an Administrative Code provision or facility policy on use of force and whether it was ignored by Defendants is not relevant to or probative" in an excessive force claim).

Finally, Caruth fails to explain how a group strip search conducted with an intent to harass tends to violate his Free Exercise rights. Caruth claims that several officials (but none of the Defendants) insulted him during the strip searches and that

9

these "abusive and humiliating remarks" are "a key component of plaintiff's [free exercise] claim." (Dkt. 122 at 3). He submits several declarations from other inmates supporting explaining that the en mass strip searches at the NRC are degrading. (Dkt. 123 Exhibit 3). Caruth does not claim, however, that he was subject to abusive comments because of his religion or that the comments were degrading of his religious beliefs. It is unclear how Caruth's religious belief and the requirement that he not be observed nude by non-Muslims is substantially burdened by humiliating comments unrelated to his religion.

Defendants' explanation regarding the necessity of group strip searches due to staffing concerns is rational and unrebutted by Caruth. Caruth presents affidavits stating that the group strip searches are humiliating, but he fails to present evidence that group strip searches are "arbitrary or irrational." This *Turner* factor weighs in favor of Defendants.

### ii.  Factor Two: Alternative Means of Exercising Right

The second *Turner* factor "is an awkward fit" where, as here, Plaintiff "does not allege that the defendants prevented him from taking some affirmative action, such as praying or fasting or attending services" but rather "that the defendants forced him to do something that violates his beliefs." *West v. Kind*, No. 17-CV-482-PP, 2020 WL 1139800, at *15 (E.D. Wis. Mar. 9, 2020). That Caruth may be able to practice his religion in other ways does not allow him to avoid an action that violates his religious beliefs. *Id.*; *see also Bradford v. Kramer*, No. 15-CV-1405-JPG-SCW, 2017 WL 1169730, at *7 (S.D. Ill. Jan. 27, 2017), report and recommendation adopted,

10

No. 15-CV-01405-JPG-SCW, 2017 WL 1152870 (S.D. Ill. Mar. 28, 2017) (Muslim inmate who brought free exercise claim challenging video surveillance of him while nude "ha[d] no real alternatives in exercising the religious right restricted."). This factor thus weighs in Caruth's favor.

### iii. Factors Three and Four: Impact of Accommodation and Availability of Ready Alternatives

With respect to the final two *Turner* factors, Caruth claims that because dividers allowing for privacy during strip searches have always been available at NRC, ready alternatives to group strip searches exist and accommodating private strip searches of Muslim inmates would not be significantly burdensome on prison administration. As Defendants argue, however, Caruth fails to present adequate facts to support this assertion. Caruth avers in his declaration that "[t]here was always a facility at the NRC to strip search, a single-man cell, for unruly inmates, transgender inmates, inmates who refused to be strip-searched in a group." (Dkt. 123 Exhibit 2 at ¶ 10). But this assertion is directly contradicted by Caruth's deposition testimony describing the strip searches at issue in the case: "Keep in mind, the stalls are up now. At [the time] time there was no stalls." (Dkt. 119 Exhibit 3 at 51-52).

Caruth relatedly argues that because NRC no longer conducts group strip searches at all, individual strip searches must have always been a ready alternative and accommodation that could have been implemented earlier. But once again, Caruth does not present admissible evidence to support this argument. Caruth states in his declaration:

11

> It is my understanding from talking with other inmates that strip searches at the NRC do not occur in group settings anymore, and those stalls are employed instead. I learned from another inmate at Pontiac … that the new practices at the NRC to conduct strip searches individually are referred to as the 'Caruth Rules,' because they were instituted after I filed this lawsuit and because of it.

(Dkt. 123 Exhibit 3 at ¶¶ 15-16). The Court must disregard these statements because they are based on inadmissible hearsay. *Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009) ("If, as here, evidence is inadmissible hearsay, we may not consider it" on a motion for summary judgment.); Fed. R. Civ. Proc. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The statements of other inmates regarding the use of stalls are out of court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). The many exceptions to hearsay are also inapplicable. Statements regarding NRC's elimination of group strip searches after Caruth's lawsuit are also inadmissible as subsequent remedial measures because Caruth offers them to demonstrate fault. *Id.* at 407. Thus, Caruth fails to rebut Defendants' contention that removing officers from their posts to accommodate individual strip searches is infeasible and would create safety risks. Factors three and four weigh in favor of Defendants.

    A balance of the *Turner* factors thus supports summary judgment in favor of the Defendants. Defendants have demonstrated a rational basis for group strip searches and Caruth has failed to satisfy his burden under *Turner* to prove that the policy is invalid under the Free Exercise Clause.

### III. Qualified Immunity

Even assuming that there was a genuine issue of material fact as to whether the group strip searches violated Caruth's free exercise rights, summary judgment is warranted based on qualified immunity. In § 1983 actions, "qualified immunity shields an official from liability for civil damages, provided that the illegality of the official's conducts was not clearly established at the time he acted." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011).[2] "The basic question is whether the state of law at the time that [Defendants] acted gave [them] reasonable notice that [their] actions violated the Constitution." *Id.*

Neither the Supreme Court nor the Seventh Circuit has considered and upheld a free exercise challenge to an individual or group strip search. While the Seventh Circuit considered a free exercise challenge to an individual strip search in *Canedy v. Boardman*, the court granted summary judgment to the defendants on grounds of qualified immunity without considering the merits of the claim. 91 F.3d 30, 33-34 (7th Cir. 1996) (involving Muslim inmate who in part challenged strip searches conducted by female officers, claiming that his faith prohibited him from being seen

---

[2] In his Amended Complaint, Caruth sued each Defendant in his or her individual capacity for money damages and official capacity for injunctive relief. (Dkt. 119 Ex. 1 at 2-3). Although the parties do not address Caruth's official capacity claims in their briefs, Caruth's official capacity claims became moot upon his transfer from NRC to Pontiac Correctional Center. *See Jones v. Bulter*, 663 F. App'x 468, 470 71 (7th Cir. 2016) (inmate's demand for injunctive relief against prison officials became moot after he transferred to another facility). Therefore, qualified immunity, which shields defendants from claims for monetary damages not injunctive relief, provides a complete defense against the individual capacity claims brought against Defendants. *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996).

nude in front of the opposite gender).³ In *Madyun v. Franzen*, an earlier Seventh Circuit case, the Court upheld a frisk search of a male Muslim inmate by a female officer under the Free Exercise Clause, but the Circuit has not yet applied its reasoning to a strip search, which is objectively more burdensome and intrusive than a frisk search. 704 F.2d 954, 960 (7th Cir. 1983). The Court is also unaware of persuasive opinions from other Circuits.

District courts, however, including two in this Circuit, have, on a consideration of the merits, upheld individual strip searches when challenged as violating an inmate's constitutional rights under the Free Exercise Clause. *See e.g, West*, 2020 WL 1139800, at *14-*15 (granting summary judgment to defendant officials on free exercise claim challenging individual strip search of Muslim inmate by transgender male on grounds that inmate's faith prohibited him from being seen nude by the opposite gender); *McRoy*, 366 F. Supp. 2d at 681 (granting summary judgment to defendant officials on free exercise claim challenging strip searches of Muslim inmates on their way to and from religious services); *Collins v. Davis*, No. 17-CV-06976-VKD, 2019 WL 4471469, at *5-*9 (N.D. Cal. Sept. 18, 2019) (granting summary judgment to defendant officials on free exercise claim challenging strip searches conducted every time a prisoner left his cell on grounds that the searches deterred his attendance of religious services). At least one district court has also upheld a group strip search challenged under the Free Exercise Clause as violating an inmate's

---

³ The court did note that "the prison had a very strong interest in having its guards observe prisoners at all times and in all situations, and it had an interest in providing equal employment opportunity to women." *Canedy*, 91 F.3d at 34.

religious belief of not exposing his body to unknown individuals. *See Beers v. Fouts*, No. 15-CV-454-SM, 2018 WL 3370628, at *3-*4 (D.N.H. July 10, 2018) (granting summary judgment to defendant prison officials).

Given the lack of controlling authority and the opinions of district courts upholding strip searches, it would not have been clear to a reasonable officer at the time that an inmate had a right to be free from group strip searches on the basis of religious beliefs. *See e.g, Canedy*, 91 F.3d at 34 (granting qualified immunity to prison officials on free exercise challenge to strip searches); *Harvey v. Segura*, No. 13-CV-01574-RBJ-BNB, 2014 WL 4057043, at *6 (D. Colo. Aug. 14, 2014), *aff'd*, 646 F. App'x 650 (10th Cir. 2016) (same); *Holland v. City of New York*, 197 F. Supp. 3d 529, 540-42 (S.D.N.Y. 2016) (same); *Lewis v. Soto*, No. 215CV02938CJCSK, 2019 WL 6486031, at *2 (C.D. Cal. Aug. 7, 2019) (same); *Beers*, 2018 WL 3370628, at *4-*5 (same).

Caruth argues that qualified immunity is inappropriate because the Defendants' actions violated a state regulatory requirement and NRC's "practices have been subsequently altered to bring them into line with those requirements." (Dkt. 122 at 9). As the Court has already discussed, however, "the mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an actionable § 1983 claim," and thus, fails to put an officer on notice that his conduct violates federal law. *Whitman v. Nesic*, 368 F.3d 931, fn. 1 (7th Cir. 2004). Defendants are entitled to qualified immunity.[4]

---

[4] Having concluded that summary judgment is appropriate as to all Defendants, the Court declines to consider Defendants' arguments that Caruth (1) has failed to prove that not being seen naked by non-Muslims is central to his religious beliefs, and (2) has not suffered physical injury necessary to claim compensatory damages.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is granted.

E N T E R:

Dated: August 17, 2020

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge